## MONA M. WILSON V. STATE OF NEBRASKA.

FILED DECEMBER 5, 1930. No. 27361.

*Charles E. Matson* and *A. C. Plantz,* for plaintiff in error.

*C. A. Sorensen, Attorney General,* and *Homer L. Kyle, contra.*

Heard before Goss, C. J., Rose, Dean, Good, Thompson, Eberly and Day, JJ.

Dean, J.

Mona M. Wilson, a married woman, was convicted in Sheridan county of having wickedly and maliciously administered a deadly poison, namely, a quantity of strychnine, to her mother, Mrs. Olive E. Loomis, and from the effects of the poison so administered, her mother died the same day. Pursuant to the submitted evidence, the jury found the defendant guilty of first degree murder and fixed the penalty at life imprisonment in the penitentiary. From the judgment on the verdict counsel for the defendant prosecute error.

This is the second appearance of this case before this court. Upon arraignment in the trial court under the original information, defendant pleaded guilty and was sentenced to serve a term of 30 years imprisonment in the penitentiary. On appeal to this court the judgment was reversed for certain errors appearing in the record and the cause was remanded to the district court for further proceedings. *Wilson v. State*, 117 Neb. 692. Before the present trial was begun, however, the defendant asked for and was granted leave to withdraw her former plea of guilty and enter a plea of not guilty on the alleged ground of mental derangement when the former plea of guilty was entered.

At the present trial the original information was amended by leave of court by the insertion of the word "intending," by interlineation before the trial commenced, to the end that the information should clearly charge that the poisoning was perpetrated by the accused with "premeditated malice, intending" thereby to "kill and murder * * * Olive E. Loomis." The defendant contends that the court erred, in that the information, as above amended, was not verified on oath before it was refiled. But we do not think the court committed reversible error in the respect noted. We have held:

"The court may, in its discretion, before trial, permit the county attorney to amend a criminal information, provided the amendment does not change the nature or identity of the offense charged, and the information as amended charges no other crime than the one on which the accused has had a preliminary examination." *Razee v. State,* 73 Neb. 732.

Objection is also made that certain witnesses were permitted to testify against the defendant whose names had not been indorsed on the information when it was filed. But, under section 10087, Comp. St. 1922, a trial judge may, in his discretion, grant permission to the prosecuting attorney to indorse the names of additional witnesses on the information before the trial and where, as in the present case, no continuance was requested by the defendant, no rights were prejudiced thereby.

It is argued that the court erred in overruling the motion to quash the information on the alleged ground of undue delay of the trial. The argument is that more than two terms of court elapsed from the time the mandate was received and filed in the district court to the time of defendant's trial and that she never at any time asked for nor did she consent to a continuance. Defendant also argues that the delay was not occasioned by lack of time to have her case heard. But an examination of the evidence and of the record in the matter of the defendant's motion for a nonsuit discloses that the court docket was overcrowded and that the services of another district judge could not then be procured. And besides, the defendant had not withdrawn her plea of guilty at the time the motion for a discharge was filed and, of course, her plea of guilty was still standing against her. While there is some correspondence in the record tending to show that defendant inquired as to the date of the trial, at no time was a formal application made for trial, nor was any objection made to a continuance. On this feature it has been held that the constitutional or statutory requirements are satisfied by a speedy first trial, and that the time for retrial is not a matter of absolute right but is addressed to the

discretion of the court. 16 C. J. 445, sec. 804. Nor do we find reversible error in the order overruling defendant's motion for a discharge.

When the information was filed, the defendant was 31 years of age and, with the exception of one year when she was teaching school, she lived with her parents. Some time before her mother died, the defendant was married to Herman Wilson, an employee on her father's farm, and after their marriage they lived on the same farm with her parents but in a separate house.

Dan Loomis, defendant's father, testified that he and his wife had been suffering from a stomach trouble for some time prior to the evening in question here, and that defendant went to Hay Springs for medicine for him and for her mother. He testified that, upon defendant's return, they each took a capsule which she brought home and gave to her parents, and that he and his wife suffered convulsions therefrom. And he also testified that the convulsions were continuous until his wife died the same evening.

From Mr. Loomis' evidence it appears that the land on which they lived was formerly owned by his wife's father, but that, upon her father's death, a life estate to the land vested in Mrs. Loomis. And it is not without significance here that provision was made in the deed that the land in question, upon the death of her mother, should become the property of the defendant.

A few days after her mother died, the defendant made a written statement and therein she confessed that she procured the empty capsules at a drug store, and that she later filled them with strychnine, which was kept on the home farm for poisoning gophers. And she admitted that she falsely told her parents that the doctor had ordered her to give each of her parents a capsule, which she administered to them, and that, from the effect of the poison-charged capsules, her parents both became violently ill and suffered convulsions. Her father recovered from the effects of the poison but, as above noted, her mother died the same evening.

The defendant's husband, Herman Wilson, testified that they were married in 1925, and that he formerly worked on the home farm for her father, but that, after some disagreements between Mr. Loomis and himself, he left the Loomis farm and found employment elsewhere. But, upon being notified of the conditions at the Loomis home, he immediately returned and was there the night Mrs. Loomis died. From his evidence it appears that his wife had frequent fainting spells after they were married and that her weight gradually became less and that he frequently noticed a tremor in her hands. He also testified that he took her to a doctor by whom certain remedies were prescribed for her, but that her condititon remained unchanged.

Certain witnesses, some of whom were related to the defendant, testified in her behalf. From their evidence it appears that she suffered occasional fainting spells before her mother died and that, on the night of her mother's death, she fainted and was carried to a couch. The defendant, according to their evidence, appeared to some of these witnesses to be unconscious of what was going on about her for some considerable time before her mother passed away. It also appears from the evidence of some of the patrons, in whose district the defendant formerly taught school, that she was a successful school teacher. Several witnesses testified that she was compelled to give up teaching because of ill health.

In respect of the defendant's condition during her imprisonment in the penitentiary, the depositions of certain witnesses who observed her there were introduced in evidence. The penitentiary matron testified that the defendant had a vacant, staring expression and that it was only at times that she would answer questions. The matron also testified that the defendant was subject to epilepsy and that, after such attacks, she would lie in bed for a day at a time. It also appears from the evidence of these witnesses that defendant often complained of headaches and pains in her head and that she was unable to do factory work on account of her physical condition. The ma-

tron's testimony was corroborated by that of another witness who acted as matron during the absence of the regular matron on a vacation. The warden of the penitentiary testified that he observed the defendant closely and found her to be in a dazed condition as though she was under the influence of a narcotic. There is also evidence tending to prove that defendant's condition has improved during her stay in the penitentiary. But the above witnesses were of the opinion that she was an incompetent person at the time of her arrival there and that she was then unable to distinguish between right and wrong.

Evidence was introduced tending to prove that certain members of the Loomis family had been or were confined in insane asylums. And the evidence of two physicians who examined defendant in the penitentiary is to the effect that she was suffering from a mental derangement at the time and that additional time should be allowed to determine her mental condition.

Dr. A. J. Molzahn testified on the part of the state and from his evidence it appears that he was called to attend the defendant's parents but that Mrs. Loomis died before he arrived. In his opinion, as related to the jury, the convulsions were brought on from the effects of strychnine poisoning. And from his recital it is disclosed that the defendant appeared to faint while he was at the Loomis home, but he testified that he did not hear her fall to the floor, and he concluded that she did not faint but lay down of her own volition. Subsequently she was taken to his hospital for observation and she remained there several days. While there he testified that the defendant admitted that she administered the strychnine to her parents. A nurse testified that, from her observation of defendant at the hospital, defendant appeared to be a person of weak intellect and that she bore the facial expression of an epileptic.

Another physician testified on the part of the state to the effect that he, together with another physician, saw and examined the defendant at the penitentiary five different times when she was first incarcerated there, and that de-

fendant was again examined by them fourteen months later. He testified that defendant "was mentally normal, and physically, at the first examination, in fair condition, and succeeding examinations showed her in better physical condition each time," and, in his opinion, defendant was sane. This physician also testified that he found no indication of epilepsy in defendant and that it was not inconsistent to conclude that her fainting spells were manifestations of hysteria only.

The record is voluminous and the evidence is conflicting as to the defendant's ability to distinguish between right and wrong at and before the time when the offense charged against her was committed. It may be noted, however, that much of the evidence in defendant's behalf was submitted by witnesses who were related either to her or to her husband. The evidence against the defendant, on the part of the state, however, was submitted in large part by witnesses who were the defendant's former neighbors and who had long known her and had advantageous opportunity to observe her conduct and actions generally. They testified that defendant was sane and knew what she was doing at the time in question here.

The evidence of the physicians who testified on the part of the defendant and that of the physicians on behalf of the state conflicts. In a criminal prosecution, the degree of mental derangement, if any, to exempt one from punishment must be such that he was unable at the time to distinguish between right and wrong in respect of the subject-matter of the inquiry. We conclude that the evidence of the witnesses as to the circumstances surrounding the commission of the offense in the present case, and the defendant's appearance and conduct at the time in question here, was sufficient to justify the jury in finding, beyond a reasonable doubt, that the defendant knew the difference between right and wrong and that she was clearly responsible for her unnatural and unlawful act. The jury heard the evidence and, of course, observed the demeanor of the witnesses who testified. And we have long held that, in such

case, where there is sufficient evidence to support the jury's findings, the verdict will not be disturbed.

A review of the record discloses that the homicide herein discussed was perpetrated in cold blood and, in view of the facts, we conclude that the defendant has forfeited the right to be at large among her fellows so far as human foresight can determine. But for her sex, the defendant might not have fared so well at the hands of the jury.

We have carefully examined the instructions given by the court of its own motion and we do not find reversible error therein. The jury were properly instructed in respect of the mental capacity of the defendant and of the material facts hereto appertaining at the time of the offense charged against her by the state.

It follows that the judgment must therefore be and it hereby is

AFFIRMED.