STATE OF NEBRASKA, APPELLEE, V. WARD PRICE, APPELLANT.

275 N. W. 2d 82

Filed February 6, 1979.   No. 42048.

Daniel W. Ryberg, for appellant.

Paul L. Douglas, Attorney General, and Jerold V. Fennell, for appellee.

Heard before SPENCER, C. J., Pro Tem., BOSLAUGH, MCCOWN, CLINTON, BRODKEY, and WHITE, JJ., and RIST, District Judge.

WHITE, J.

Defendant-appellant was charged with the murder of Tracie Tate, the daughter of defendant's wife Virginia.

The defendant was convicted by a jury of murder in the second degree and was sentenced to a term of life imprisonment in the Nebraska Penal and Correctional Complex. The defendant appeals and makes 13 assignments of error in this court. They generally relate to six separate categories: (1) The overruling of the plea in abatement challenging the sufficiency of the preliminary hearing; (2) the admission of five exculpatory statements made by the defendant; (3) the admission of a prior inconsistent statement of a witness and refusal of the trial court to permit the defendant to introduce evidence of a prior inconsistent statement of an impeaching witness; (4) error in refusal to dismiss the first degree murder charge or, in the alternative, to reduce the charge to second degree murder or manslaughter; (5) failure to give NJI No. 14.52A; and (6) claim that the sentence was excessive.

Tracie Lynne Tate was born on June 14, 1975, and was slightly over 2 years of age when she died on June 22, 1977. The defendant and the victim's mother, Virginia, lived at apartment 11, 4606 Redman Street, Omaha, Nebraska, on the third floor of a 2½ story brick apartment building at that address. The apartment building consisted of a level of semibasement apartments, sometimes referred to as

garden apartments, with 2 full stories above the level of the garden apartments. The apartment exited onto a wooden porch landing encompassed by an iron railing. The first flight of steps from the apartment down consisted of 13 wooden stairs onto a concrete landing and then a separate flight of wooden steps consisting of 7 or 8 stairs. The evidence most favorable to the State established that Tracie's mother, Virginia, left the apartment at approximately 4 p.m., on June 22, 1977, with an individual by the name of Lee Carter to go to her mother's apartment and from there proceeded to the area of 24th and Lake Streets in Omaha, Nebraska. When Virginia left her apartment, Tracie was sleeping and was left in the care of the defendant. Virginia had gone to 24th and Lake Streets to sell prescription drugs which she had obtained that day. At approximately 8 p.m., that evening, Virginia telephoned to her apartment and spoke to the defendant after Clifford Jones, a friend of the defendant and Virginia, met her on the street and told her that she was to go home or to call home. Virginia testified that during the telephone conversation the defendant informed her Tracie had fallen down some stairs, that she had blood on her feet, that he was going to give her a bath, and that Virginia should come home at 1 a.m. Virginia testified she was not worried about Tracie because: "* * * the way he was talking, it was like she just fell and wasn't hurt." At 2:30 a.m., Virginia again called home and was informed by the defendant that "he couldn't get Tracie awake." Virginia arrived home shortly thereafter and found the defendant giving mouth-to-mouth resuscitation to Tracie. The rescue squad of the Omaha fire department was summoned. Fire Captain Stolinski found Tracie lying on a bed, examined her for vital signs, found none, and then took her to Immanuel Medical Center. She was accompanied by Virginia and the defendant. Tracie was pronounced dead shortly af-

ter arrival at the hospital by Dr. Dean McGee, the physician on duty in the emergency room at Immanuel Medical Center. He testified that when he examined Tracie at 3:19 a.m., she had been dead for some 5 to 7 hours. Tracie had no clothes on at the time he examined her. Dr. McGee testified that Tracie had blood present in the left ear canal, extensive contusions or bruising of her head, a large hematoma or blood clot swelling in the back of the head in the occiput area; two discolored areas about the ankles on the dorsum or top side of the feet which appeared to him to be eschar or healing type of scabbing that occurs following a burn; and multiple puncture-type wounds on the soles of both feet, around the pubic or vaginal area, and scattered over the buttocks. Tracie's body was then taken to the Douglas County morgue where Dr. Blaine Roffman, a specialist in pathology, performed an autopsy. Externally, Dr. Roffman found a purplish discoloration and swelling of the entire forehead which extended bilaterally to and beyond both ears. He found the same type of discoloration around both parts of the external openings of the nose along with a great deal of swelling in both lips. There were tears in the mucosis side of the lower lip or the inside portion of the lower lip, and discoloration around both eye areas. He observed a small amount of blood in the left ear canal. Dr. Roffman also observed pink discolored areas on the tops of both feet showing sloughing of the superficial layer of skin which represented to him defects which are similar to second degree burns, a superficial abrasion on the right heel, and a 1-centimeter abrasion on the inner aspect of the left heel. The vaginal canal was bloody and there was a tear in the vaginal canal which measured 11 millimeters, or approximately ½ inch, and another tear in the left inner fold of the labia which is adjacent to the clitoris. The anal canal was also bloody and showed several

small superficial tear lacerations. Dr. Roffman also observed many purplish pin-like marks on the buttocks, a slight scratch in the inner aspect of the right thigh, and little scratch abrasions on the left side of the neck. In the internal findings, Dr. Roffman's examination revealed hemorrhages on the right side of the thoracic cage at about the level of the eighth and ninth ribs. There was hemorrhage inside the muscle that surrounds these ribs. This, he observed, was superficial. He discovered the thymus gland, which is just underneath the chest cavity, showed some hemorrhage. An incision of the scalp was made and Dr. Roffman testified that the entire scalp was hemorrhagic and swollen showing a diverse pattern of recent hemorrhage. Hemorrhages were discovered in the right posterior occipital portion of the brain, i.e., the back lobe of the brain on the under surface, and on the left lateral lobe of the cerebellum. There was blood underneath the subarachnoid membrane which covers the brain proper. No cuts were observed on the skull itself. Over objection, Dr. Roffman was asked: "* * * based on your examination, do you have an opinion as to whether or not the skull was hit more than one time? A. Yes. Q. And what is that opinion? * * * I think there had been some several blows to cause these types of injuries. * * * Q. Am I correct in saying that there were indications of blows all around the head? * * * A. There had to be multiple blows in various portions of the head to cause all that diffuse hemorrhage on the scalp, also in connection with the swelling and discolorations around the eyes and around the lips and lacerations of the lips could not have been sustained by one action. * * * The age and the appearance of these wounds would be consistent with them all occurring within a short period of time." Dr. Roffman further testified that the tears and wounds in the vaginal area were inflicted shortly preceding death and the puncture

wounds in the vaginal and posterior region were of recent origin. The burn injuries on the feet were consistent with a pouring-type injury according to Dr. Roffman and not an immersion-type injury.

Dr. Roffman testified that the cause of death was cerebral edema and brain damage secondary to trauma to the head. "Q. Are the blows to the head, then, the primary cause? A. Yes." Dr. Roffman was then handed a photograph of the area of the outside of the defendant's apartment building. "Q. * * * If the testimony had been or the evidence had been to the effect that she (Tracie) had fallen from the second stair down a number of stairs, would that be consistent with your findings? * * * A. The injuries which I have described would be inconsistent with a fall down these stairs of six or seven, eight or nine, or ten or eleven. The injuries that I have described to you are not consistent with a fall down these stairs, in my opinion." Dr. Roffman testified that he based his opinion on the numerous blows that would have been needed to have sustained the injuries to Tracie's head and the absence of any significant abrasion to the nose or other surfaces of the body; and, that the findings of the lacerations in the mouth, the vagina, and the anus were not consistent with a fall. Finally, Dr. Roffman was asked whether or not the injuries to Tracie's head were consistent with blows from a hand. The answer was "Yes." The jury could have concluded from Dr. Roffman's testimony that Tracie Tate had been tortured, possibly sexually molested, and died as a result of a battering by blows to her head.

The defendant's first group of errors assigned relate to the denial of his plea in abatement. The defendant suggests that the evidence was not sufficient to bind him over for trial on a charge of first degree murder. We said in Kruger v. Brainard, 183 Neb. 455, 161 N. W. 2d 520, and in State v. Franklin, 194 Neb. 630, 234 N. W. 2d 610, that the error, if any, in

the ruling of the District Court on the plea in abatement is cured if the evidence at trial is sufficient to permit the jury to find guilt beyond a reasonable doubt. Defendant suggests that the holding in Kruger v. Brainard, *supra*, does not obtain under a first degree murder conviction where the defendant may be held without bail. The defendant in this case overlooks the fact that bail was set at $50,000 with the option of the defendant to post a 10 percent amount thereof so that the theoretical denial of his constitutional rights by being denied of his liberty with an inadequate preliminary hearing does not here obtain.

The defendant next complains he was denied his right of appeal or right of review of the hearing on probable cause. The defendant's contention may be answered easily by further reference to State v. Franklin, *supra*: "We know of no principle which would require this court to entertain a pretrial appeal of the trial court's review of the decision of the magistrate binding the defendant over after a preliminary hearing. It would appear that our statutory provisions for preliminary hearings and our rule of practice under which the trial court itself reviews the magistrate's determination are clearly sufficient to meet the constitutional mandates of the Fourth Amendment to the Constitution of the United States."

The defendant also complains and assigns as error that there were no specific findings of fact made by the trial court in the order denying the preliminary hearing. Defendant has not pointed out and we are not informed of any requirement that the findings of fact be specifically set out.

The next assignments of error relate to the admission in evidence of statements by the defendant given to police officers at Immanuel Medical Center, where Tracie Tate was taken, and at the apartment to which the officers and the defendant returned, at

the officers' request, after Tracie was pronounced dead in the hospital; and of two other statements taken at the police station by police officers after the defendant was under arrest. We shall deal with the statements in order.

Sergeant Thomas Gutchewsky arrived at Immanuel Medical Center at approximately 3:25 a.m., on June 23, 1977. He spoke with another officer who told him that Tracie Tate had died from a fall, that Tracie Tate was the daughter of Virginia, and that Ward Price was babysitting Tracie. He observed Tracie's body and testified that at that time he was suspicious, by reason of the bruises and burn marks, that the death was not accidental. He had conversation with the defendant. At that time Ward Price was not under arrest and was not in custody. Sergeant Gutchewsky asked the defendant what happened. The defendant stated that he was babysitting Tracie, that he took out the trash about 8:30 p.m., on June 22, and that he left the baby inside along with three of his acquaintances. While emptying the trash he saw the little girl come out and fall down 8 to 10 steps on the back stairway. He picked the baby up, took her inside, and bathed her. She was bleeding and crying. The entire conversation took approximately 5 minutes. Sergeant Gutchewsky and the defendant went to the scene. Sergeant Gutchewsky examined the stairs for blood, which would corroborate defendant's story, and finding none, placed the defendant Price under arrest. The arrest was made immediately after Ward Price said he wanted to go home; that they, the police, could call him later; and he then started to walk away.

Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, applies only to "in-custody" interrogation. Defendant's objection to the admission of the first statement is not well taken. Later decisions of the United States Supreme Court have caused some difficulty in drawing the line between custodial and

noncustodial investigation. See 23 Loyola L. Rev. 1057. It is sufficient to point out that, at this point, the investigation was at a very preliminary stage. The testimony of Sergeant Gutchewsky indicates he had not finally determined that a crime had been committed. The actions of the defendant reveal that he felt he was free to go. We thus disagree with the contention that the statements were made to Sergeant Gutchewsky while the defendant was in custody.

The second statement was made on June 23, at 6:30 a.m., in the Omaha police station. Officer K. G. Miller advised the defendant of his rights under Miranda v. Arizona, *supra*. This time the defendant Ward Price made a statement that Virginia left the apartment about 7:30 p.m. Four friends of the defendant dropped by to visit him at the apartment. All but one, Lee Carter, left prior to Tracie's injuries. According to this version, Lee went with the defendant to take some trash out and together they saw the baby fall down the steps. At some point, unspecified in time, he told Lee to go out and contact Virginia to inform her of the injury. The interview lasted approximately 1 hour 15 minutes.

The third statement was taken at approximately 7:45 p.m., on June 23. The defendant was interviewed by an Officer Gregory Thompson of the Omaha police department. The defendant was again advised of his rights and told essentially the same story as in the second interview, except that this time Lee Carter stayed in the house while Price took out the garbage. He also stated that Tracie's feet had been burned about a week prior to her death when Tracie's mother spilled cooking oil on them. The interview lasted approximately 1 hour 10 minutes.

The fourth statement began at 10:30 p.m., at the police station. Sergeant Michael Fleharty interviewed the defendant. Again the defendant's rights

were read to him and the defendant again waived them. He told essentially the same story except that now both the defendant Ward Price and Lee Carter were inside when Tracie walked out onto the back steps and fell. Sergeant Fleharty then confronted Ward Price with a contrary statement from Lee Carter whereupon Ward Price changed his story to say that Lee Carter agreed to watch the child while Price took out the garbage. In return, the defendant would give Carter some Valium. The baby fell during this time.

The fifth interview occurred on June 24, 1977, at 9:45 a.m. The defendant asked the jailer if he could again see Officer Miller who had conducted the second interview. Officer Miller again advised the defendant of his rights and the defendant waived them. The defendant then told Miller that he, Price, was not even present when the fall occurred. He claimed he had left the baby with Lee Carter and borrowed Lee's car to go purchase some cigarettes. Essentially, the defendant attacks the admission of statements two, three, four, and five into evidence by suggesting that when the defendant Ward Price walked away from the officer just prior to his arrest at the apartment, he had effectively terminated the interview and exercised his right to remain silent, and that an attempt to obtain a statement from the defendant within 2 hours after he had exercised that right is not overcome by a mere recitation of the Fifth Amendment rights. See Michigan v. Mosley, 423 U. S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313. The answer to this contention is simple. The showing made by the officer was sufficient for the court and the jury to find that the statements were voluntarily given after an understanding of the Miranda rights. The defendant does not deny that the statements were voluntary but alleges simply that his subsequent repeated waiver of the right to be silent was not effective. The State met the burden in each case

and the statements were properly admitted.

At a break in the trial, the prosecutor had occasion to speak with one Pamela King, a friend of Clifford Jones and the defendant. The substance of the conversation was that a week after the incident, Clifford E. Jones told Pamela King that he had seen Ward Price pour hot cooking oil on the baby. The statement of Clifford Jones in the possession of the prosecutor did not indicate this fact. The prosecutor informed the court and defense counsel of the conversation with Pamela King and requested the court's permission to endorse the name of Clifford Jones on the information. (He was a previously-named anticipated witness for the defense.) The prosecutor indicated that he intended to use Jones: "* * * it corroborates to some degree what all the evidence has been, that the injuries occurred at that residence * * * were at the time he told me (in his statement) 9:00 o'clock at night and, yes, I intend to call witnesses to impeach him, assuming that he denies it."

The defense objected on account of "lack of statutory notice, and based upon this new so called impeachment evidence it does come as a surprise." The court allowed the endorsement of Clifford Jones as a witness. Subsequently Jones denied making the statement to King.

Pamela King was called and the defendant requested, prior to her being asked to relate the conversation, for a cautionary instruction that the evidence was introduced solely to impeach the credibility of Jones. The court so instructed and the defendant does not here object to the form of the cautionary instruction.

Without objection, in response to the prosecutor's request, Pamela King testified as to the conversation of Clifford Jones: "A. Well, when he came over to the car, then he started telling us, he said, well, I was there, I was there when it happened, and every-

thing. And so we said, well, what happened, you know. He said that he had -- he was in the kitchen and he saw Ward take boiling hot oil. He said it was hot oil, it was boiling hot, he said, and he poured it all over Tracie's feet, and he said it just turned white, he said, just white, he said, and he ran and he put her in the tub, a tub of cold water, and he said he kept saying, man, call the police, take her to the hospital, do something, man. And he said that he went into the bathroom, Cliff went into the bathroom to see about her, to, you know, lift her out of the tub, and when he lifted her up, she said, oh, help, help, no. He said she started crying and moaning and squirming and everything. He said he put her back in the tub and he said Tracie would talk. As soon as Ward came in the room, she just got quiet.

"And Ward took her out of the tub, and he was supposed to have been, I guess, changing her diaper or something, and he went to lay her on the bed, and he said that Ward was feeling around Tracie's privacies and everything. He said he thought it was kind of strange the way he was doing it, you know, as if a man was going to be with a woman. He said, but, he said, it wasn't none of his business so he didn't say nothing. And so he said he had left and he said he came back and knocked on the door and Ward said who is it, who is it. He said it's me, you know. He said it took him a long time to come to the door, and then when he went in there, Ward had Tracie in the living room on the floor.

"He said, man, she won't wake up, she won't wake up. He said, man, you ought to call the police, take her to the hospital, something. He said, no, man, no. Virginia would be mad at me, Virginia would be mad at me, what am I going to do. And he picked her up, and she was all limp, and her head just kind of fell back, and he said he wouldn't call the police or nothing.

"And Cliff said that he left and he went down the

street later that evening, and he said he told Virginia, he said, Virginia, you better call home, you better do something because your baby, something is wrong, you know. And he just -- that is what he said Ward did."·

An instruction limiting the jury's consideration to credibility was again given at the close of the evidence, and the defendant does not object to the form of the instruction.

The defendant had a copy of Clifford Jones' statement prior to trial. He did not request a continuance. The decision to allow Clifford Jones to be endorsed on the information was addressed to the discretion of the court and the court did not abuse this discretion. See Wilson v. State, 120 Neb. 468, 233 N. W. 461.

In this court, the defendant broadens his attack. He first contends that the prosecutor knowingly used perjured testimony (of Jones) thus violating the Fourteenth Amendment rights of the defendant and requiring a new trial. The contention approaches frivolity. The statement that "a prosecutor may not knowingly use perjured testimony" is shorthand for the rule that he may not knowingly use perjured testimony *for the purpose of obtaining a conviction.* See, for example, Mooney v. Holohan, 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791. The direct conflict in the testimony does indeed suggest that the testimony of one or the other was false. But, unless some other rule was transgressed, it is not error to submit the testimony of both to the jury.

A second, more formidable argument is made by the defendant for the first time in this court. In State v. Isley, 195 Neb. 539, 239 N. W. 2d 262, this court affirmed the decision of the District Court rejecting an attempt by a defendant to introduce hearsay testimony under the guise of impeachment. It is the position of the defendant that a similar attempt, this time by the prosecutor, is apparent in the

introduction of the testimony of Pamela King.

The Rules of Evidence codified in sections 27-101 to 27-1103, R. R. S. 1943, are in large measure those proposed by this court's committee on practice and procedure which were in turn taken from the then newly proposed federal rules. However, some changes were made. Under proposed Rule 801 d (1) (A), evidence of a prior inconsistent statement of a witness, such as Jones' statement related by King, would have been admissible as substantive rather than just impeachment evidence. The Legislature rejected this change in existing law and continued to restrict, with certain exceptions not relevant here, such evidence to impeachment purposes. In doing so, it expressed its intention that convictions not rest on unsworn statements.

On the other hand, the Legislature's apparent purpose in adopting section 27-607, R. R. S. 1943, was to codify the abandonment by this court in State v. Fronning, 186 Neb. 463, 183 N. W. 2d 920, of the ancient and universally criticized rule that a party "vouches" for the credibility of his own witnesses and may not impeach them. There is no indication that it also intended to create an exception to the limitation, referred to in the previous paragraph, on the use of prior inconsistent statements. The completely unrestricted use of section 27-607, R. R. S. 1943, would create the temptation for a party to introduce "impeachment" testimony when none was actually needed, leaving his opponent to rely on a possibly ineffective cautionary instruction.

It is suggested in Graham, The Relationship Among Federal Rules of Evidence, 55 Tex. L. Rev. 573, that the requirements of "surprise" and "affirmative damage," originally developed as exceptions to the voucher rule, be reinstated - not as a return to the old rule but to prevent the introduction of prior inconsistent statements for substantive purposes under the guise of impeachment. This court

rejected those requirements when it rejected the voucher rule in State v. Fronning, *supra*, and their reinstatement here, for whatever reason, would likely engender unnecessary confusion. A balancing test is suggested in 3 Weinstein's Evidence, s. 607 (01), p. 40 (Cum. Supp. 1978). Under that test, evidence with dubious value for impeachment but a comparatively high prejudicial impact would be excluded under section 27-403, R. R. S. 1943. Had that test been applied here, it might have been determined that the State had little need to impeach Jones. He did say the defendant was administering mouth-to-mouth resuscitation to the victim, but the result of his testimony was hardly to exculpate the victim. In fact, Jones' testimony corroborated to some extent the time sequence presented by the State. The witness King was a friend and cousin of the victim's mother who had originally been under suspicion. Thus, the possibility of bias was present. It is a possibility then that the testimony of King should have been excluded.

But even accepting that possibility, we do not feel compelled to reverse. Both King and Jones were present for cross-examination so there was no violation of defendant's constitutional right to confrontation. See Nelson v. O'Neill, 402 U. S. 622, 91 S. Ct. 1723, 29 L. Ed. 2d 222. Furthermore, no objection was made, other than that of surprise, to the testimony of Jones and King. Errors alleged here but not presented to the trial court do not ordinarily constitute grounds for reversal. See State v. Brown, 174 Neb. 387, 118 N. W. 2d 328. More importantly, though, the evidence of guilt, other than that complained of, is so substantial that we do not hesitate to say that the error, if any, was inconsequential. The defendant invites speculation that the jury could have found that the victim was injured in a fall down some stairs. But neither the defendant nor anyone else testified such a fall actually occurred. There

is, then, not one shred of evidence to contradict the circumstantial, but weighty, evidence that the victim died of injuries inflicted intentionally by the defendant. Errors in rulings on the admissibility of evidence which do not injuriously affect the substantial rights of the accused are not grounds for reversal. See State v. Hogan, 194 Neb. 207, 231 N. W. 2d 135.

The defense further asserts as error the trial court's refusal to allow him to call on Fannie Claxton to testify that in a conversation with Pamela King a week before the death, King asserted that Tracie's burns were caused by accidental immersion in hot water. The trial court was in error in finding that section 27-613, R. R. S. 1943, requires that the witness to be impeached be given an opportunity to explain or deny the apparent inconsistent statement prior to its introduction. That foundational requirement may be met either before *or* after the introduction of the impeaching evidence. See Fenner, Competency and Examination of Witnesses Under Article VI of the Federal Rules of Evidence and the Nebraska Evidence Rules, 9 Creighton L. Rev. 559, at p. 599. Our decision as to the King testimony renders the question of impeachment of the impeaching evidence academic.

The defendant's assertion that the court erred in failing to dismiss the murder charge or reduce the charge to manslaughter is likewise without merit. The only evidence of the cause of death, evidence by the pathologist, suggests - indeed demands - the conclusion that Tracie was battered and tortured repeatedly. Unquestionably the defendant was present and, in fact, in charge of the victim. The only other person shown to have been near the victim was Clifford Jones, who saw the victim after the injuries were inflicted. The evidence was sufficient to justify the trial court to charge first degree murder to the jury.

The defendant next asserts that the trial court erred by refusing to submit NJI No. 14.52A to the jury (whether defendant was advised of his Miranda rights, as a prerequisite to a consideration of a confession or statement as evidence).

In State v. Scott, 200 Neb. 265, 263 N. W. 2d 659, we said: "We conclude that the trial court did not err in this case by refusing to give NJI No. 14.52A * * * particularly in view of the fact that defendant did not request it." We now hold that a trial court is not required to give NJI No. 14.52A even if requested.

The defendant contends that the sentence is excessive. It is not. The crime was shocking and indicative of a depraved mind. Any less sentence would depreciate the seriousness of the offense.

No error requiring reversal being found, the judgment and sentence of the trial court are affirmed.

AFFIRMED.